

SEAN ROUNDTREE
1149 E. Hidalgo Ave.
Phx, AZ 85010
602/472.8269

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

FILED ____ LODGED
RECEIVED ____ COPY

JUL 1 1 2012

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

Sean Alex Roundtree,

     M. S. C.,

     E. J. N.,

    Plaintiffs

    vs.

Jerry Colangelo, Phoenix Suns, Bryan Colangelo;
Phoenix Arena Sports Ltd. and d/b/a Arizona
Rattlers; Danny White; Matt Anderson, ATC;
Dr. Joel S. Sellers; Dr. D. Matthew
Maddox; Dr. Edward P. McDermott;
Dr. Richard J. Emerson d/b/a Center
for Sports Medicine & Orthopedic;
Dr. Jeffery Copoloff; Dr. Michael T.
Kates d/b/a Arizona Foot Health (formerly
Arizona MedicalFootcare Center; State
Compensation Fund of Arizona; Mayo
Foundation for Medical Education & Research
d/b/a Mayo Clinic Scottsdale; Estate of
Dr. Kenneth A. Johnson; Dr. Todd A. Kyle;
Dr. William J. Leonetti d/b/a Arizona Foot &
Ankle Care P.C; Industrial Commission of
Arizona; APS Healthcare (formerly HCX, Inc.);
Chris Fendon, Esq. d/b/a Fendon Law Firm;
Dennis R. Kurth, Esq.; John Doe(s); and Jane
Doe(s) d/b/a XYZ Corp.

     Defendants

CV 12-1491-PHX-GMS

Civil Action No. _____

JURY TRAIL DEMANDED

## PLAINTIFF'S ORIGINAL COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:**

1

1. Plaintiff, SEAN ALEX ROUNDTREE, (ROUNDTREE) acting by and through himself as Pro Se, files this Original Complaint on behalf of himself and minor children, E. J. N. (6 months) and M. S. C. (17) against Defendants, JERRY COLANGELO individually; PHOENIX SUNS individually; BRYAN COLANGELO individually; PHOENIX ARENA SPORTS LTD individually and d/b/a ARIZONA RATTLERS; DANNY WHITE individually; MATT ANDERSON, ATC individually; JOEL S. SELLERS, D.O. individually and d/b/a CENTER FOR SPORTS MEDICINE AND ORTHOPEDICS; Defendant D. MATTHEW MADDOX, D.O. individually and d/b/a CENTER FOR SPORTS MEDICINE AND ORTHOPEDICS; Defendant EDWARD P. McDERMOTT, D.O. individually and d/b/a CENTER FOR SPORTS MEDICINE AND ORTHOPEDICS; Defendant RICHARD J. EMERSON, D.O. individually and d/b/a CENTER FOR SPORTS MEDICINE AND ORTHOPEDICS; Defendant MICHAEL T. KATES, DPM individually and d/b/a ARIZONA FOOT HEALTH (formerly, American Medical Footcare Center); Defendant JEFFEREY COPOLOFF, DPM individually; STATE COMPENSATION FUND ARIZONA individually; APS HEALTHCARE (formerly, HCX, Inc.) individually; MAYO FOUNDATION FOR MEDICAL EDUCATION AND RESEARCH individually and d/b/a MAYO CLINIC SCOTTSDALE; Defendant ESTATE OF KENNETH A. JOHNSON, M.D., individually; Defendant DR. TODD A. KYLE, individually; Defendant DR. WILLIAM J. LEONETTI, individually and d/b/a ARIZONA FOOT & ANKLE CARE, P.C., Defendant CHRIS FENDON ESQ., individually and d/b/a FENDON LAW OFFICES; DENNIS KURTH, ESQ., for causes of action as follows:

## JURISDICTION AND VENUE

2. The District of Arizona has jurisdiction over the subject matter of these claims pursuant to 28 U.S.C. §§ 1332 (A)(2).

3. The venue of this suit lies in the District of Arizona, pursuant to 28 U.S.C. §§ 1391 (A)(2)(3) and (B)(2)(3).

4. ROUNDTREE respectfully requests trial by Jury.

## DEFENDANTS

5. Defendant JERRY COLANGELO (J.COLANGELO) is an individual who resides at XXXXXXX, and serving as the managing owner of PHOENIX SUNS (SUNS) from 1987 to 2005 and PHOENIX ARENA SPORTS (PAS) limited from 1992 to 2005.

6. Defendant SUNS is an Arizona corporation registered in XXXX. Its principal place of business is located at 201 E. Jefferson Street, Phoenix, Arizona 85004-2412.

7. Defendant BRYAN COLANGELO (B.COLANGELO) is an individual who resides at XXXXXXX. Serving as president of Def. PAS, from 1992 to 2005 and President and General Manger Def. SUNS from 1997 to 2005.

8. Defendant PAS is an Arizona corporation d/b/a ARIZONA RATTLERS (RATTLERS) and registered in XXXX. Its principal place of business is located at 201 E. Jefferson Street, Phoenix, Arizona 85004-2412. PAS have a designated agent for service in XXX and thus, may be served through its registered agent: XXXXXX.

9. Defendant DANNY WHITE (WHITE) is an individual who resides at XXXXXXX. Serving as General Manager and Head Football Coach for Def. RATTLERS from 1992 to 2004.

10. Defendant MATT ANDERSON, ATC (ANDERSON) is an individual who resides at XXXXXXX. Serving as Head Athletic Trainer for Def. RATTLERS from 1992 to 2005.

11. Defendants JOEL S. SELLERS, D.O. (SELLERS); D. MATTHEW MADDOX, D.O. (MADDOX); EDWARD P. McDERMOTT, D.O. (McDERMOTT); and RICHARD EMERSON, D.O. (EMERSON) together (Def. PHYSICIANS) own and operate Def. CENTER FOR SPORTS MEDICINE AND ORTHOPEDICS. PLLC (CSMO) as employees of Def. SUNS.

12. Defendant SELLERS is an individual who resides at XXXXXXX, and works at XXXX.

13. Defendant MADDOX is an individual who resides at XXXXXXX, and works at XXXX.

14. Defendant McDERMOTT is an individual who resides at XXXXXXX, and works at XXXX.

15. Defendant EMERSON is an individual who resides at XXXXXXX, and works at XXXX.

16. Defendant CSMO is an Arizona Corporation. Its principal place of business is located at XXXXXXX. CSMO has a designated agent for service and thus, must be served through the Arizona Rules of Federal Procedure or as directed by this Court.

17. Defendant MICHAEL T. KATES, DPM (KATES) is an individual who resides at XXXXXXX. Operating a private practice, Def. ARIZONA FOOT HEALTH (formerly, American Medical Footcare Center) (Def. AFMC) as an employee of Def. SUNS.

18. Defendant JEFFERY COPOLOFF, DPM (COPOLOFF) is an individual who resides at XXXXXXX. He served as an employee of Def. KATES.

19. Defendant AMFC is an Arizona corporation registered in XXXX. Its principal place of business is located at 3401 W. Bethany Home Road, Phoenix, Arizona 85017. Def.

AMFC has a designated agent for service in XXX and thus, may be served through its registered agent: XXXXXX.

20. Defendant STATE COMPENSATION FUND ARIZONA (SCF) is a corporation registered in XXXX. Its principal place of business is located at 3030 N. 3rd Street, Phoenix, Arizona 85012-3068. Defendant SCF has a designated agent for service in XXXXXX and thus, may be served through its registered agent: XXXXXX. Def. SCF is the insurance company for Def. PAS.

21. Defendant APS Healthcare (formerly HCX, Inc.), (HCX) is a corporation registered in XXXX. Its principal place of business is located at 3030 N. 3rd Street, Phoenix, Arizona 85012-3068. Def. SCF has a designated agent for service in XXXXXX and thus, may be served through its registered agent: XXXXXX. Def. HCX managed the healthcare for Def. SCF.

22. Defendant MAYO FOUNDATION FOR MEDICAL EDUCATION AND RESEARCH (FOUNDATION) is a corporation registered in XXXX. Its principal place of business is located at XXXX. FOUNDATION has a designated agent for service in XXX and thus, may be served through its registered agent: XXXXXX. FOUNDATION is a corporation d/b/a MAYO CLINIC SCOTTSDALE (MAYO) in Arizona.

23. Defendant MAYO is a corporation registered in XXXX. Its principal place of business is located at 13400 East Shea Boulevard Scottsdale, Arizona 85259. MAYO has a designated agent for service in XXX and thus, may be served through its registered agent: XXXXXX.

24. Defendant ESTATE OF KENNETH A. JOHNSON, M.D (JOHNSON), JOHNSON died in a plane crash in early December 1993. He resided at XXXX and is the Chief of

Orthopedic Surgery at Defendant MAYO. Def. McDERMOTT referred ROUNDTREE to Def. JOHNSON and he performed second toe only surgery (Hammertoe, second toe, left).

25. Defendant DR. TODD A. KYLE, (KYLE) is an individual who resides at XXXXXXX, and served as First Assistant to Def. JOHNSON for ROUNDTREEs second toe only surgery (Hammertoe, second toe, left).

26. Defendant DR. WILLIAM J. LEONETTI, (LEONETTI) is an individual who resides at XXXXXXX and hired as an agent for Def. SCF to conduct the Independent Medical Exam on ROUNDTREE July 14, 2011 that alerted him to investigate further.

27. Defendant ARIZONA FOOT & ANKLE CARE, P.C. (AFAC), is a corporation registered in Arizona. Its principal place of business is located at 3201 W. Peoria Avenue, #A200, Phoenix, Arizona 85029. Defendant AFAC has a designated agent for service in XXXXXX and thus, may be served through its registered agent: XXXXXX.

28. Defendant DENNIS R. KURTH, ESQ., is an individual who resides at XXXXXXX and is an Arizona Workmen's Compensation Attorney at XXXXX.

29. Defendant CHRIS FENDON, ESQ., (FENDON) is an individual who resides at XXXXXXX and is Arizona Workmen's Compensation Attorney at Def. FENDON LAW FIRM (FENDONLAW).

30. Defendants John Does and Jane Does and d/b/a XYZ Corps.

**CONSIDERATIONS**

31. ROUNDTREE applies the Discovery Rule of Harm, Constructive Fraud, Fraudulent Concealment, Continuing Violation and Nuisance & Trespass theories to toll the statute of limitations as explained below.

32. ROUNDTREE is Pro Se however, should he secure representation at a later date, he respectfully request this Honorable Court allow him reasonable attorney fees and costs.

33. All times material to this Complaint:

  a. The fraud described herein is actual and constructive to limit Workmen's Compensation liability.

  b. ROUNDTREEs injury is a direct result of DEFENDANTS acting in a consistent pattern of behavior in violation of RICO Statutes Section § 1962 (c)(b), including mail fraud;

  c. DEFENDANTS owed a duty to ROUNDTREE, there was a breach of that duty, and damages related to the breach of the duty;

  d. ROUNDTREE holds DEFENDANTS vicariously liable for the claims described herein through the theory of respondeat superior, the principle of ostensible or apparent agency.

  e. "DEFENDANTS" refers to the entities and persons referenced in the preceding paragraphs 1¶ through 33¶.

### PLEADING AND SPECIAL NOTICE

34. ROUNDTREE, brings this action against DEFENDANTS for acting alone and in concert with others; pursuing a common plan or design and actively taking part in fraud to limit Workmen's Compensation liability (WC fraud) in association with ROUNDTREEs June 18, 1993, industrial injury, as of the date of this document.

35. In formulating and continue to formulate, direct, control and/or participate in the commission of WC fraud DEFENDANTS violated ROUNDTREE pursuant: Aiding &

Abetting; Battery; Bad Faith; Breach of Fiduciary Duty (Request for Tort Damages); Breach of the Implied Covenant of Good Faith & Fair Dealing (Request for Tort Damages); Civil Conspiracy; Civil Rights Violations 42 USC §1981, §1983 and § 1985(a); Gross Negligence based in Medical Malpractice; Intentional Infliction of Emotional Distress; Legal Malpractice; Misrepresentation; Negligence; Negligence Infliction of Emotional Distress; Civil remedies under RICO Statutes; and Tortious Interference with a Business Expectancy.

36. DEFENDANTS have continued to manage and control the 450 plus page file of evidence (#93-46568) for the past 19 years. They are very familiar with the facts. However, in opposition to DEFENDANTS record, ROUNDTREEs record (#93-46568) is supplemented with Def. ICA file (#93-279406248) and *chronologically* ordered, befitting detailed evidentiary matter here referred to as (The RECORD). It will show clear and convincing evidence of the claims above.

37. Beware the man, looking to go undetected, deliberately shrouding the record in disinformation, constructed confusion, misrepresentations, omissions, fraudulent concealment and constructive fraud. He is skilled at his art." Continue looking and the spirit of truth (fact) conquers, tolling the statutes, sounding the death-kneel.

### POINTS OF RULES AND AUTHORITIES

**All Defendants Have A Duty To Roundtree**

38. A fiduciary relationship is a confidential relationship whose attributes include great intimacy, disclosure of secrets or entrusting of power. In a fiduciary relationship, the fiduciary holds 'superiority of position' over the beneficiary. This superiority of position may be demonstrated in material aspects of the transaction at issue by a substitution of the fiduciary's will.

39. DEFENDANTS have a duty to ROUNDTREE and hold a demonstrated 'superiority of position' over him in every relationship and that 'superiority of position' is distinctly seen in the fiduciary's will in all the transactions at issue.

40. "There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless: (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives to the other a right to protection." *Fedie v. Travelodge Int'l*, 162 Ariz. 263, 265, 782 P.2d 739, 741 (App. Div. 2, 1989).

41. "Duties of care may arise from special relationships based on contract, family relations, or conduct undertaken by the defendant. A special or direct relationship, however, is not essential in order for there to be a duty of care...

   a. Under Arizona common law, various categorical relationships can give rise to a duty. These include but are not limited to, the landowner-invitee relationship, the tavern owner-patron relationship, and those 'special relationships' recognized by § 315 of the Restatement (Second) of Torts that create a duty to control the actions of others." *Gipson v. Kasey*, 214 Ariz. 141, 145, ¶19, 150 P. 3d 228, 232 (2007). See also *Fedie v. Travelodge Int'l*, 162 Ariz. 263, 265, 782 P.2d 739, 741 (App. Div. 2, 1989) (listing special relationships such as parent-child, master-servant, possessor of land-licensee, guardian-ward, carrier-passenger, innkeeper-guest, landlord-invitee, guardian-ward, teacher-student, and jailer-prisoner).

**Doctrine of Respondeat Superior**

42. Under Arizona law "the conduct of a servant is within the scope of employment if it is of the kind the employee is employed to perform, it occurs substantially within the authorized time and space limit, and it is actuated at least in part by a purpose to serve the master." *Love v. Liberty Mut. Ins. Co.*, 158 Ariz. 36, 38, 760 P.2d 1085, 1087 (App. 1988*); Duncan v. State*, 157 Ariz. 56, 61, 754 P.2d 1160, 1165 (App. 1988). As explained by the court in *Ray Korte Chevrolet v. Simmons*, 117 Ariz. 202, 207, 571 P.2d 699, 704 (App. 1977).

43. What is more, an employee is acting within the scope of his employment while he is doing any reasonable thing, which his employment expressly or impliedly authorizes him to do or which may reasonably be said to have been contemplated by that employment as necessarily or probably incidental to the employment. In other words, an employer is liable for the conduct of its employee if at the time the injury occurred "the employee was performing a service in furtherance of [the] employer's business." *Ohio Farmers Ins. Co. v. Norman*, 122 Ariz. 330, 332, 594 P.2d 1026, 1028 (App. 1979).

44. "The true test of whether an employer is liable for the act of his employee is whether at the time of the commission of the injury the employee was performing a service in furtherance of his employer's business, not whether it was done in exact observance of the detail prescribed by the employer." *Smith v. Am. Express Travel Related Servs. Co.*, 179 Ariz. 131, 135, 876 P.2d 1166, 1170 (App. Div. 1, 1994).

45. An employer may be held liable for the intentional tort of its employee if the tort arises out of the employment. *District Certified TV Service, Inc. v. Neary,* 122 U.S.App.D.C. 21, 22, 350 F.2d 998, 999 (1965). Courts will impute liability to the master (employer) when the agent is engaged in the work that its principal has employed or directed him to

10

do and ... in the effort to accomplish it. When such conduct comes within the description that constitutes an actionable wrong, the corporation principal,... is liable not only for `the act itself, but for the ways and means employed in the performance thereof.' *Penn Central Transp. Co. v. Reddick,* 398 A.2d 27, 31 (D.C.1979) (quoting *Lyon v. Carey,* 174 U.S.App.D.C. 422, 426, 533 F.2d 649, 653 (1976) (emphasis in original). Liability may be extended to situations "where the employment provides a `peculiar opportunity and ... incentive for'" the tortious activity. *Penn Central Transp. Co. v. Reddick, supra,* 398 A.2d at 31 (citations omitted). The critical question is whether the conduct "was foreseeable as being within the range of responsibilities entrusted to the employee." *Johnson v. Weinberg,* 434 A.2d 404, 408 (D.C.1981). Thus, in assault cases, it has been held that the master may be liable for an assault arising out of and committed in the course of employment. *Lyon v. Carey, supra,* 174 U.S.App.D.C. at 427, 533 F.2d at 654.

**Joint and Several Liability**

46. DEFENDANTS have a fiduciary relationship with ROUNDTREE. DEFENDANTS are herein jointly and severally liable for acting in concert, pursuing a common plan or design to commit tortious acts against ROUNDTREE and actively taking part in it. Ariz. Rev. Stat. Ann. § 12-2506 (West 1994 & Supp. 1997).

**Vicarious Liability**

47. ROUNDTREE holds DEFENDANTS vicariously liable through the principle of ostensible or apparent agency. Arizona courts have recognized the principle of ostensible or apparent agency in the hospital-physician context. *See Gregg v. National Medical Health Care Services,* 145 Ariz. 51, 699 P.2d 925 (1985); *Barrett v. Samaritan Health Services,* 153 Ariz. 138, 735 P.2d 460 (Ct. App. 1987).

**Arizona Courts Have Examined the Manner, that the Discovery Rule of Harm, Fraudulent Concealment, Constructive Fraud, Continuing Violation and Nuisance & Trespass Theories Apply to toll the Statutes of Limitations**

48. The relevant statute of limitations bars claims such as this two years "after the cause of action accrues." A.R.S. § 12-542. Application of the statute's simple words has been difficult and the moment at which accrual occurs has been the subject of controversy in cases dealing with claims of professional or fiduciary negligence. Use of the word "accrues" in the statute of limitations permits judicial construction of the events or knowledge that will trigger accrual. *Kenyon v. Hammer*, 142 Ariz. 69, 76 n. 6, 688 P.2d 961, 968 n. 6 (1984).

**Arizona "Discovery of Harm" Rule**

49. ROUNDTREE would like this Honorable Court to consider how Arizona applies the discovery rule to determine when a cause of action accrues. *Commercial Union Ins. Co. v. Lewis & Roca*, 183 Ariz. 250, 254, 902 P.2d 1354, 1358 (App. 1995). "[T]he discovery rule applies not only to the discovery of negligence, but also to discovery of causation and damage." (*Id.* at 253, 902 P.2d at 1357). Remember "the important inquiry in applying the discovery rule is whether the plaintiff's injury or the conduct causing the injury is difficult for plaintiff to detect." *Gust, Rosenfield & Henederson v. Prudential Ins. Co.*, 182 Ariz. at 590, 898 P.2d 968 (1995). ROUNDTREE would like this Honorable Court to consider the difficulty he had in detecting his injury as well as the conduct causing his injury.

50. In *Kowske*, the court of appeals held that the cause of action in a wrongful death case accrued when the surviving husband obtained medical records concerning his deceased wife. The statute was triggered at that time even though the doctor who forwarded the records stated that he "found no signs of misdiagnosis or mistreatment" and said that the

12

autopsy also revealed nothing significant. *Id.* at 536, 863 P.2d at 255. The court held that the statute was not tolled even though plaintiff was not aware that his wife's death was attributable to negligence until he later consulted an attorney. *Id.* at 537, 863 P.2d at 256.

51. *Kowske* certainly is factually relevant to the present case. Both *Kowske* and the present case are situations in which the fact of injury is known but the possibility of negligence is difficult to discern. There are instances, of course, in which an unfortunate result would immediately put the plaintiff on notice that the result is not only unfavorable but might be attributable to some fault and should be investigated. See, e.g., *Trede v. Family Dental Ctr.,* 147 Ariz. 25, 27, 708 P.2d 116, 118 (App.1985) (injury to plaintiff's hand during tooth extraction); *Speed v. DeLibero,* 23 Conn.App. 437, 580 A.2d 1242 (1990) (patient underwent elective outpatient surgery and died from anesthesia-induced brain injury). In such cases, one may say as a matter of law that the patient is not only aware of the injury but also on notice to investigate whether the injury is likely attributable to the fault of someone responsible for her care.

52. The bright-line rule drawn by *Kowske* and similar cases is properly applied to such cases and the action accrues even though the plaintiff has not sought an expert opinion on malpractice or a legal opinion that a cause of action exists. See *Kowske*, 176 Ariz. at 537-38, 863 P.2d at 256-57. There are also cases, and this is one, in which factual context does not permit finding, as a matter of law, that a patient was promptly on sufficient notice of the confluence of "what" and "who" and that an unhappy result should be investigated to determine whether it is attributable to fault of those responsible for the patient's care. Indeed, it is often the rule that the question of accrual is for the jury. *Gust,*

*Rosenfield & Henederson v. Prudential Ins. Co.,* 182 Ariz. 586, 591, 898 P.2d 964, 969 (1995).

53. Over the years, courts have discussed accrual in a series of cases. From the early days Courts have treated the question of accrual as one of equitable tolling. Thus, when a defendant secretly removed ore from a mine, Arizona Courts held it was equitable to commence the limitations period on the plaintiffs discovery of the trespass and conversion. *Tom Reed Gold Mines Co. v. United Eastern Mining Co.*, 39 Ariz. 533, 535, 8P.2d 449, 450 (1932).

54. In an early dental malpractice case, that twice came to The Arizona Supreme Court, the Court construed *Tom Reed* as having two distinct holdings: first, that "limitation does not begin to run against a trespass until the plaintiff knows, or reasonably should know, of the trespass, and [second,] that if the wrong constituting the cause of action is concealed, limitation will not begin to run until such concealment is discovered, or reasonably should have been discovered." *Acton v. Morrison*, 62 Ariz. 139, 144, 155 P.2d 782, 784 (1945).

55. The second time the Arizona Supreme Court held that a patient was not barred from bringing an action against his dentist because the patient "should not be penalized for failing for even this long period of time to discover the true seat of his troubles." *Morrison v. Acton*, 68 Ariz. 27, 36, 198 P.2d 590, 596 (1948).

56. The dentist in *Morrison* left a piece of metal in the patient's jaw after surgical removal of a wisdom tooth. As a result, the patient was left with serious pain in his mouth. The dentist was aware that his drill bit had broken and that this might be the cause of the plaintiff's post-surgical problems, but he failed to explain this to the plaintiff.

57. The Court held the statute of limitations tolled until the plaintiff's discovery of the facts. In *Morrison* the plaintiff knew his continuing pain and the failure of his jaw to heal were attributable to the dentist's procedure, but he was unaware of the dentist's negligence. A jury could find the same to be true in the instant case.

58. The court of appeals adopted and applied the *Morrison* doctrine in *Mayer v. Good Samaritan Hospital,* 14 Ariz. App. 248, 482 P.2d 497 (1971). In *Mayer,* the plaintiff's injuries were caused by an episode of insulin shock sustained in 1964. Although the injuries became apparent that same year, the plaintiff did not file her action until four years later, approximately six months after discovering the physician's negligent conduct.

59. Declining to interpret *Morrison* as resting only on the basis of fraudulent concealment, the court of appeals held that *Mayer's* action was not time barred. The Arizona Court Appeals concluded that the legislature intended to adopt a fair and just statute of limitations that would balance the ease or difficulty a plaintiff has in understanding the cause of an injury with a plaintiff's tardiness in allowing a claim to become stale after the first indications of injury are present. The court said:

    a.  [W]e specifically reject the defendants' alternate argument that the statute begins to run from the time the injuries manifest themselves. However, this point in time may be important in considering the issue as to whether the plaintiff by the exercise of reasonable diligence should have known of defendants' negligence (*Id.* at 252, 482 P.2d at 501).

60. In *Kenyon*, this court adopted *Mayer's* formulation of the discovery rule. (142 Ariz. at 73 n. 1, 688 P.2d at 965 n. 1). The Arizona Supreme Court approved that formulation again in a case involving application of the discovery rule to a breach of contract claim, holding

that "the important inquiry in applying the discovery rule is whether the plaintiff's injury or the conduct causing the injury is difficult for plaintiff to detect." [1] *Gust, Rosenfeld*, 182 Ariz. at 590, 898 P.2d at 968 (discovery rule applied seventeen years after landlord's breach of lease agreement containing "most favored nations" clause). The statute of limitations protects defendants from "stale claims where plaintiffs have slept on their rights." (*Id.*). A "blamelessly uninformed plaintiff cannot be said to have slept on his rights." (*Id.* at 591, 898 P.2d at 969).[2]

61. The Supreme Court next addressed this problem in *Doe v. Roe*, 191 Ariz. 313, 955 P.2d 951 (1998). Reversing summary judgment, the Court held there was a genuine factual issue concerning application of the discovery rule, even though the plaintiff filed the action more than two years after she had her first memory that she had been sexually abused by her father.

62. While an injured person "need not know all the facts underlying a cause of action to trigger accrual ...[,] the plaintiff must at least possess a minimum requisite of knowledge sufficient to identify that a wrong occurred and caused injury." *Id.* at 323 ¶☐32, 955 P.2d at 961 ¶32 (second emphasis added) (citations omitted). *Doe* makes clear it is not enough that a plaintiff comprehends a "what"; ☐there must also be *reason* to connect the "what" to a particular "who" in such a way that a reasonable person would be on notice to investigate whether the injury might result from fault.

---

[1] The instant case presents both inquires, in applying the discovery rule as both ROUNDTREEs injury and the conduct causing that injury were very difficult to detect.

[2] The Courts opinion in *Gust, Rosenfeld* relies on the discovery rule and not fraudulent concealment, while the concurring justice would have based the holding only on fraudulent concealment. Id. at 591-92, 898 P.2d at 969-70 (Martone, J., concurring).

63. While it is ordinarily sufficient when the plaintiff is aware of the injury and its causative agent (the "what and who" elements), summary judgment is warranted only if the failure to go forward and investigate is not reasonably justified. The plaintiff could not be charged with "a duty to file a complaint based on information she subjectively believed to be false or unbelievable at the time." (*Id.* at 324 ¶35, 955 P.2d at 962 ¶35).

64. Thus, the "jury must determine at what point Plaintiff's knowledge, understanding, and acceptance in the aggregate provided sufficient facts to constitute a cause of action." (*Id.* at ¶36). The Court pointed out that determinations of the time when discovery occurs and a cause of action accrues "are usually and necessarily questions of fact for the jury" (*Id.* at 323 ¶32, 955 P.2d at 961 ¶32) (citing *Gust, Rosenfeld*, 182 Ariz. at 591, 898 P.2d at 969).

65. In *Walk v. Ring*, 202 Ariz. 310, 44 P.3d 990 (2002) the court of appeals believed that Plaintiff had a reasonable opportunity to discover Defendant's negligence because she was placed under the care of other doctors. No doubt Plaintiff did have an opportunity to discover Defendant's negligence, but the core question is whether a reasonable person would have been on notice to investigate.

66. Plaintiff's doctor assured her he had done nothing wrong, and we do not believe that as a matter of law she was on notice to commence investigating whether negligence was involved. This is especially true when the doctors to whom Defendant later referred Plaintiff for treatment failed to disclose to her their belief that Defendant had been negligent.

67. While her failure to question the consulting doctors for such information could be taken as a lack of diligence, we do not believe it can be said as a matter of law that a reasonable

person in this circumstance can be required to undertake such questioning or be held accountable for not doing so. This is the very sort of factual determination that must be left for the jury under *Mayer*, *Kenyon*, and other cases discussed above.

68. Given that *Kowske* was decided before *Doe*, it is understandable that the *Kowske* opinion focuses more on traditional conceptions of the "what and who" elements than on the plaintiff's knowledge or constructive knowledge that a wrong might have occurred. Today, we disapprove *Kowske* to the extent that it suggests accrual occurs in cases of this type before a plaintiff is put on reasonable notice to investigate whether the injury is attributable to negligence.[3] The existence of injury or untoward result is, of course, one of the factors to be considered on the question of reasonable notice, and our holding today is not meant to relieve a potential plaintiff of the reasonable duty to timely inquire whether any basis exists for legal action.

69. The analysis that the Arizona Supreme Court has followed since *Tom Reed* in 1932 to date is applicable in the present case. The "what" is the fact of injury. With respect to those in a professional or fiduciary relationship with the tortfeasor, an adverse or untoward result, or a failure to achieve an expected result, is not, as a matter of law,

---

[3] Kowske's holding on this point cannot be reconciled with the language, and some holdings, in a number of other Arizona cases that state that the statute is triggered when the plaintiff knew or should have known that her doctor, lawyer, or other professional had been negligent. See, e.g., *Yazzie v. Olney, Levy, Kaplan & Tenner*, 593 F.2d 100, 103 (9th Cir.1979) (legal malpractice action accrues when client knows or should know of lawyer's negligence); *Kenyon*, 142 Ariz. at 73, 688 P.2d at 965 (medical malpractice); *Insurance Co. of N. Am. v. Superior Court*, 162 Ariz. 499, 502, 784 P.2d 705, 708 (App.1990) (negligence of insurance agent); *Arizona Mgmt. Corp. v. Kallof*, 142 Ariz. 64, 66, 688 P.2d 710, 712 (App.1984) (legal malpractice); *Long v. Buckley*, 129 Ariz. 141, 143, 629 P.2d 557, 559 (App.1981) (same); *Russo v. Diethrich*, 126 Ariz. 522, 617 P.2d 30 (App.1980) (medical malpractice); *Sato v. Van Denburgh*, 123 Ariz. 225, 227, 599 P.2d 181, 183 (App.1979) (accounting malpractice action accrues when plaintiff knew or should have known of defendant's negligent conduct) (citing *Morrison*, 68 Ariz. 27, 198 P.2d 590; *Abernethy v. Smith*, 17 Ariz.App. 363, 498 P.2d 175 (1972) (medical malpractice)).

always sufficient notice. To trigger the statute of limitations, something more is required than the mere knowledge that one has suffered an adverse result while under the care of a professional fiduciary. The history of the present statute supports consideration the Arizona "Discovery of Harm" Rule.

**Other Jurisdictions**

70. Well-reasoned authority from other jurisdictions supports our conclusion. See, e.g., *Kitzig v. Nordquist*, 97 Cal.Rptr.2d 762 (App. 2000). The plaintiff in *Kitzig* underwent a series of unsuccessful oral surgeries over three years. Her injuries were apparent early in the treatment, and like *Ring*, she received assurances from her dentist. Again like *Ring*, she went to another dentist and received further assurances. Toward the end of the third year, she sought the advice of a third dentist, who questioned the original dentist's work.

71. After filing suit, she countered the defendant's statute of limitations defense with the statutory discovery rule, and the court held for her. "[T]he statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing." (*Id.* at 767) (quoting *Jolly v. Eli Lilly & Co.*, 44 Cal.3d 1103, 245 Cal.Rptr. 658, 751 P.2d 923, 927 (1988)).

72. The court concluded that *Kitzig* could not be found, as a matter of law, to have subjectively suspected any wrongdoing with respect to her implant procedures at that time. (*Id.* at 768-69). At no time earlier than the date of this complaint, ROUNDTREE did not, as a matter of law, subjectively suspected any wrongdoing with his injury.

73. A similar result was reached in *Hughes v. United States*, 263 F.3d 272 (3d Cir.2001). The court held that the statute did not run against a patient who became a quadruple amputee because of gangrene resulting from an allergic drug reaction until the patient learned that

had the reaction been timely diagnosed, it could have been treated and arrested with medication.

74. The action accrued only when the plaintiff discovered the known injury was due to "progression of the disease rather than the disease itself" and that "failure of his doctors to diagnose, treat or warn him led to his deteriorating condition." *Id.* at 276 (quoting *Augustine v. United States*, 704 F.2d 1074, 1078 (9th Cir.1983)); □see also *Waits v. United States*, 611 F.2d 550 (5th Cir.1980) (holding that Federal Tort Claims Act claimant's awareness of injury was not enough to trigger statute, absent knowledge of act or omission responsible for causing it).

75. ROUNDTREE would like this Honorable Court to consider the discovery of the untreated progression of his industrial injury rather the injury itself as well as the failure of DEFENDANTS to diagnose, treat or warn him including but not limited to substandard care, treatment, surgery, post-operative care and interfering with treatment of medical services in the execution of WC fraud scheme.

**Fraudulent Concealment and Constructive Fraud**

76. ROUNDTREE would like this Honorable Court to consider Fraudulent Concealment, wherein the running of the statute of limitations may be tolled where the plaintiff presents evidence that the defendant concealed the facts giving rise to the cause of action and thereby prevented the plaintiff from filing the claim in a timely manner. *Walk v. Ring*, 202 Ariz. 310, 44 P.3d 990 (2002); *Mohave Electric Cooperative, Inc. v. Byers*, 189 Ariz. 292, 942 P.2d 451 (App. 1997).

77. Our Supreme Court has discussed this matter in *Acton v. Morrison*, 62 Ariz. 139, 155 P.2d 782 (1945), and as follows:

a. "… This court, [], adopted a rule which we believe is far more consonant with justice in the decision rendered on the first appeal of this case, *Acton* v. *Morrison*, supra, wherein "plaintiff's allegations of fraud and concealment were held sufficient to toll the running of the statute until the date of discovery of the fraudulent conduct." *Morrison* v. *Acton*, 68 Ariz. 27, 33, 34, 198 P.2d 590, 594 (1948). See also *Leech v. Bralliar, D.C.*, 275 F.Supp. 897 (1967). ROUNDTREE would like this Honorable Court to consider Constructive Fraud. Thus, making Constructive Fraud a jury issues on the question of statute of limitations.

78. It is true as our Arizona Supreme Court stated:

a. "The test, therefore, is not whether the action is in form one of fraud, but whether it seeks relief on account of fraud in the original transaction." *Griffith v. State of Arizona*, 41 Ariz. 517, 528, 20 P.2d 289, 293 (1933). ROUNDTREE seeks fraud relief in all original transactions.

b. "[ROUNDTREE] is therefore relieved of the duty of diligent investigation required by the discovery rule and the statute of limitations is tolled until the fraud and concealment is discovered." Which is the date of this document, instantly. *Ring*, 44 P.3d 990 (2002).

**Continuing Violation Theory**

79. ROUNDTREE would like this Honorable Court to consider, Arizona's continuing violation theory. DEFENDANTS have violated ROUNDTREE since June 18, 1993 and continue to violate him as to the date of this document in the reopening of his workmen's compensation claim (The RECORD, *generally*).

**Nuisance & Trespass Theory**

80. ROUNDTREE would like this Honorable Court to consider Arizona nuisance and trespass theory that courts have found a cause of action not barred although the otherwise applicable statute of limitations had run since the first violation occurred. *City of Tucson v. Apache Motors*, 74 Ariz. 98, 106, 245 P.2d 255, 260 (1952) (statute of limitation for temporary or continuing nuisance accrues on date of successive injury); *Garcia v. Sumrall*, 58 Ariz. 526, 532-33, 121 P.2d 640, 643 (1942) (continuing trespass by cattle); *Henshaw v. Salt River Valley Canal Co.*, 9 Ariz. 418, 420-21, 84 P. 908, 909-10 (Terr. 1906) (failure to furnish shareholders with ongoing water supply).

81. Nuisance and trespass theories apply to protect interests different than contract law and do not require a court to find and enforce the intention of the contracting parties. Compare, *Armory Park Neighborhood Ass'n v. Episcopal Cmty. Servs.*, 148 Ariz. 1, 4, 712 P.2d 914, 917 (1985) (private nuisance a nontrespassory interference with enjoyment of property), and *MacNeil v. Perkins*, 84 Ariz. 74, 82, 324 P.2d 211, 216 (1958) (trespass involves "'injury of the person or property of another'"), quoting 87 C.J.S. Trespass § 1, with Powell, 211 Ariz. 553, ¶ 14, 125 P.3d at 377 (restrictive covenant interpreted to give effect to parties' intent), and Restatement § 4.1 (same), and *United Dairymen of Ariz. v. Schugg*, 212 Ariz. 133, ¶20, 128 P.3d 756, 761 (App. 2006) (implied covenant of good faith and fair dealing protects reasonable expectation of parties). Thus, making nuisance and trespass theories a jury issue on the question of statute of limitations.

## ROUNDTREE'S CLAIMS

107.   **COUNT 1:** ROUNDTREE claims DEFENDANTS acted with Bad Faith against ROUNDTREE. A bad faith claim arises from the breach of an insurer's implied covenant of good faith and fair dealing, which imposes a duty on the insurer to act in good faith in

dealing with the insured on a claim. *Noble v. Nat'l Am. Life Ins. Co.*, 128 Ariz. 188, 190, 624 P.2d 866, 867 (1981).

108.     Bad faith occurs "when the insurer 'intentionally denies, fails to process or pay a claim without a reasonable basis.'" *Zilisch*, 196 Ariz. at 237, ¶20, 995 P.2d at 279 (quoting *Noble*, 128 Ariz. at 190, 624 P.2d at 868). Mere mistake and inadvertence are not sufficient to establish a bad faith claim. *Miel v. State Farm Mut. Auto. Ins. Co.*, 185 Ariz. 104, 110, 912 P.2d 1333, 1339 (App. 1995). If an insurer acts honestly and does not place paramount importance on its own interests, it should not be held liable. *Rawlings v. Apodaca*, 151 Ariz. 149, 157, 726 P.2d 565, 573 (1986).

109.     **COUNT 2:** ROUNDTREE claims DEFENDANTS aided & abetted the tortious conduct claimed above against ROUNDTREE. "Claims of aiding and abetting tortious conduct require proof of three elements: (1) the primary tortfeasor must commit a tort that causes injury to the plaintiff; (2) the defendant must know that the primary tortfeasor's conduct constitutes a breach of duty; and (3) the defendant must substantially assist or encourage the primary tortfeasor in the achievement of the breach." *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 485, ¶34, 38 P.3d 12, 23 (2002). See also Restatement (Second) of Torts § 876(b) (1979).

110.     **COUNT 3:** ROUNDTREE claims DEFENDANTS committed Battery against ROUNDTREE: "[W]e hold that if a patient's consent is obtained by a health care provider's fraud or misrepresentation, a cause of action for battery is appropriate." *Duncan v. Scottsdale Med. Imaging, Ltd.*, 205 Ariz. 306, 311, ¶20, 70 P.3d 435, 440 (2003). "To establish a battery claim, a plaintiff must prove that the defendant

intentionally caused a harmful or offensive contact with the plaintiff to occur." *Johnson v. Pankratz* 196 Ariz. 621, 623, ¶6, 2 P.3d 1266, 1268 (App. Div. 1, 2000).

111.     "[I]n an action for assault and battery, malice is an appropriate basis for punitive damages and that malice may be inferred or implied from the nature of the acts complained of and the surrounding circumstances." *Barker v. James*, 15 Ariz.App. 83, 87, 486 P.2d 195, 199 (App. Div. 1, 1971). "Generally, assumption of risk is not a defense to the intentional tort of assault and battery." *Blankinship v. Duarte*, 137 Ariz. 217, 222, 669 P.2d 994, 999 (App. Div. 2, 1983).

112.     **COUNT 4:** ROUNDTREE claims DEFENDANTS committed Breach against ROUNDTREE.  The remedy for breach of the implied covenant is ordinarily contract damages, but in certain circumstances, can also provide tort damages. *Tucson Title Ins. Co. v. D'Ascoli,* 94 Ariz. 230, 234, 383 P.2d 119, 121 (1963) (finding a breach of fiduciary duty and that after a breach, "all damages resulting from any deviation" may be recovered). *see also Rawlings v. Apodaca,* 151 Ariz. 149, 159-60, 726 P.2d 565, 575-76 (1986) (enumerating factors for a court to consider when evaluating the availability of tort damages for a contract breach). ROUNDTREE respectfully requests this Honorable Court consider tort damages.

113.     Comment d of the Restatement (Second) of Contracts § 205 (1981), explains that "bad faith may be overt or consist of inaction," and a person may "violate the obligation of good faith in performance even though the actor believes his conduct to be justified." Indeed, good faith emphasizes faithfulness to "an agreed common purpose and consistency with the justified expectations of the other party." *Id.* § 205 cmt. a. "In Arizona, a covenant of good faith and fair dealing is implied in every contract." *Maleki v.*

24

*Desert Palms Prof'l Props., L.L.C.*, 222 Ariz. 327, 333, ¶28, 214 P.3d 415, 421 (App. Div. 1, 2009).

114.     "A party may breach the implied covenant even in the absence of a breach of an express provision of the contract by denying the other party the reasonably expected benefits of the agreement." *Nolan v. Starlight Pines Homeowners Ass'n,* 216 Ariz. 482, 489, ¶27, 167 P.3d 1277, 1284 (App. Div. 1, 2007). "Proof of a breach of the implied covenant of good faith and fair dealing requires a preponderance of the evidence." *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395,* 201 Ariz. 474, n. 18, 38 P.3d 12, 31 n. 18 (2002).

115.     "This covenant requires that neither party act to impair the right of the other to receive the benefits that flow from their agreement or contractual relationship. As a general rule, an implied covenant of good faith and fair dealing cannot directly contradict an express contract term. Accordingly, the relevant inquiry always will focus on the contract itself, to determine what the parties did agree to." *Kuehn v. Stanley*, 208 Ariz. 124, 132, 91 P.3d 346, 354 (App. Div. 2, 2004) (internal quotations and citations omitted).

116.     Some general factors that will persuade that the conduct was extreme and outrageous (1) there was a pattern of conduct, not just an isolated incident; (2) the plaintiff was vulnerable and the defendant knew it; (3) the defendant was in a position of power; (4) the defendant owed the plaintiff a fiduciary duty.

117.     **COUNT 6:** ROUNDTREE claims DEFENDANTS, acting in concert/civil conspiracy in commission of WC fraud against ROUNDTREE, committed Aiding & Abetting; Battery; Bad Faith; Breach of Fiduciary Duty (Request for Tort Damages);

Breach of the Implied Covenant of Good Faith & Fair Dealing (Request for Tort Damages); Civil Conspiracy; Civil Rights Violations 42 USC §1981; §1983; and §1985(3); Gross Negligence based in Medical Malpractice; Intentional Infliction of Emotional Distress; Legal Malpractice; Misrepresentation; Negligence; Negligence Infliction of Emotional Distress; Criminal and Civil remedies under RICO Statutes; and Tortious Interference with a Business Expectancy.

118.     "[F]or there to be liability based on a civil conspiracy, two or more people must agree to accomplish a particular tortious act." *Dube v. Likins*, 216 Ariz. 406, 413, ¶ 15, 167 P.3d 93, 100 (App. Div. 2, 2007). See also Restatement (Second) of Torts § 876. "While a trier of fact often has to infer an actual agreement to participate in the tortious conduct, such an inference should be based in part on the relationships between the actors and the actions (the proximity in time and place of the acts and the duration of the actors' joint activity) before drawing such an inference.

119.     Mere suspicious cooperative activity between the alleged conspirators may not amount to clear and convincing evidence of an actual agreement to participate in the tortious conduct." *Dawson v. Withycombe*, 216 Ariz. 84, 104, ¶ 56, 163 P.3d 1034, 1054 (App. Div. 1, 2007).

120.     "[A] mere agreement to do a wrong imposes no liability; an agreement plus a wrongful act may result in liability." *Baker ex rel. Hall Brake Supply, Inc. v. Stewart Title & Trust of Phoenix, Inc.,* 197 Ariz. 535, 542, ¶ 30, 5 P.3d 249, 256 (App. Div. 1, 2000).

121.     "The existence of a conspiracy may be inferred from the nature of the acts, the relationship of the parties, the interests of the conspirators, or other circumstances, and

express agreement or tacit concert will, if proven, suffice to create liability." *Mohave Elec. Co-op., Inc. v. Byers*, 189 Ariz. 292, 306, 942 P.2d 451, 465 (App. Div. 1, 1997).

122.     **COUNT 7:** ROUNDTREE claims DEFENDANTS violated ROUNDTREE pursuant Civil Rights Violations 42 USC §1981; §1983; and §1985(a) conspiring against ROUNDTREE to defraud him of his Arizona & U.S. Constitutional Right to WC.

123.     **COUNT 8:** ROUNDTREE claims DEFENDANTS conspired to defraud ROUNDTREE. "Conspiracy to defraud must be proven by clear and convincing evidence." *Elliott v. Videan*, 164 Ariz. 113, 116, 791 P.2d 639, 642 (App. Div. 2, 1989). "A corporation cannot conspire with itself any more than a private individual can, nor with its directors if they are acting in the corporation's behalf." *Rowland v. Union Hills Country Club*, 157 Ariz. 301, 306, 757 P.2d 105, 110 (App. Div. 2, 1988).

124.     "A showing of fraud requires (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it be acted upon by the recipient in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the right to rely on it; (9) his consequent and proximate injury." *Echols v. Beauty Built Homes, Inc.,* 132 Ariz. 498, 500, 647 P.2d 629, 631 (1982). See also *Green v. Lisa Frank*, Inc., 221 Ariz. 138, 156, ¶53, 211 P.3d 16, 34 (App. Div. 2, 2009); *Taeger v. Catholic Family & Cmty. Servs.*, 196 Ariz. 285, ¶28, 995 P.2d 721, 730 (App. Div. 1, 1999).

125.     **Count 9:** ROUNDTREE claims DEFENDANTS committed Intentional Infliction of Emotional Distress (IIED) against ROUNDTREE. "The tort of intentional infliction of emotional distress requires proof of three elements: First, the conduct by the defendant

must be "extreme" and "outrageous"; second, the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct; and third, severe emotional distress must indeed occur as a result of defendant's conduct." *Citizen Publ'g Co. v. Miller,* 210 Ariz. 513, 516, ¶11, 115 P.3d 107, 110 (2005) (emphasis in original). See also *Ford v. Revlon,* Inc., 153 Ariz. 38, 43, 734 P.2d 580, 585 (1987); *Lucchesi v. Frederic N. Stimmell, M.D., Ltd.,* 149 Ariz. 76, 78-79, 716 P.2d 1013, 1015-16 (1986); *Watts v. Golden Age Nursing Home,* 127 Ariz. 255, 258, 619 P.2d 1032, 1035 (1980).

**Extreme and Outrageous Conduct**

126.　　"[T]here is liability where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community ... in which ... an average member of the community would ... exclaim, 'Outrageous!'" *Ford v. Revlon, Inc.,* 153 Ariz. 38, 43, 734 P.2d 580, 585 (1987) (quoting Restatement (Second) of Torts § 46 cmt. d). See also *Watts v. Golden Age Nursing Home,* 127 Ariz. 255, 258, 619 P.2d 1032, 1035 (1980).

127.　　"In determining whether a defendant's conduct comes within these parameters, comment h to the RESTATEMENT (SECOND) OF TORTS § 46 provides: It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so. Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability (emphasis added).

128.     Further, as the terms 'outrageous conduct' and 'severe emotional distress' are not readily capable of precise legal definition, a case-by-case analysis is required. Nevertheless, factors that have been traditionally considered by a jury or court include: (1) the position occupied by the defendant and (2) defendant's knowledge that the plaintiff is peculiarly susceptible to emotional distress by reason of some physical or mental condition" *Lucchesi v. Frederic N. Stimmell, M.D., Ltd.,* 149 Ariz. 76, 79, 716 P.2d 1013, 1016 (1986).

**Intent or Reckless Disregard**

129.     The intentional or reckless disregard element may be satisfied in situations where an actor, who has an affirmative duty to act, fails to take action. *Ford v. Revlon, Inc.,* 153 Ariz. 38, 43-44, 734 P.2d 580, 585-86 (1987). The intentional or reckless conduct "element is satisfied where the wrongdoer has the specific purpose of inflicting emotional distress or where he intended his specific conduct and knew or should have known that emotional distress would likely result." *Pankratz v. Willis,* 155 Ariz. 8, 13, 744 P.2d 1182, 1187 (App. Div. 1, 1987).

**Severe Emotional Distress**

130.     The actor's conduct must cause emotional distress that is "so severe that no reasonable person could be expected to endure it." *Pankratz v. Willis,* 155 Ariz. 8, 17, 744 P.2d 1182, 1191 (App. Div. 1, 1987). "The courts have also uniformly insisted that the emotional distress suffered be severe. A line of demarcation should be drawn between conduct likely to cause mere 'emotional distress' and that causing 'severe emotional distress.'" *Midas Muffler Shop v. Ellison,* 133 Ariz. 194, 198-99, 650 P.2d 496, 500-01 (App. Div. 1 1982) (internal citations omitted) (listing examples of severe emotions distress).

131.     The emotional distress suffered by the plaintiff must be "severe." This standard is quantified by the intensity, duration, and any physical manifestations of the distress. A lack of productivity or a mental disorder, documented by a mental health professional, is typically required here, although acquaintances' testimony about a change in behavior could be persuasive.

132.     **COUNT 10:** ROUNDTREE claims DEFENDANTS committed Intentional Interference with Business Expectancy (IIEB) against ROUNDTREE for future professional contracts in the Arena Football League and/or Canadian Football League and/or National Football League Contracts. "The elements of a cause of action for intentional interference with contract are: (1) a business expectancy between the plaintiff and a third party; (2) knowledge of the defendant that the business expectancy exists; (3) intentional interference by the defendant that caused the third party to breach the contract; (4) a showing that the defendant acted improperly, and (5) a showing that damage resulted to the plaintiff." *Pasco Indus., Inc. v. Talco Recycling, Inc.,* 195 Ariz. 50, 62, ¶ 54, 985 P.2d 535, 547 (App. Div. 1, 1998). See also *Snow v. Western Sav. & Loan Ass'n,* 152 Ariz. 27, 34, 730 P.2d 204, 211 (1987); *Wagenseller v. Scottsdale Mem. Hosp.*, 147 Ariz. 370, 386-88, 710 P.2d 1025, 1041-43 (1985).

133.     Courts "give the greatest weight to the first two factors, the nature of the defendant's conduct and the defendant's motive." *Safeway Ins. Co., Inc. v. Guerrero,* 210 Ariz. 5, 12, ¶ 22, 106 P.3d 1020, 1027 (2005). "Fraudulent misrepresentation or concealment can, under certain circumstances, constitute 'improper conduct' for purposes of the intentional interference tort." *Safeway Ins. Co., Inc.*, 210 Ariz. 5, 13, ¶ 28 (2005).

134.     "[I]ntent is shown by proving that the interferor either intended or knew that a particular result was substantially certain to be produced by its conduct." *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund,* 201 Ariz. 474, 494, ¶77, 38 P.3d 12, 32 (2002).

135.     "Whether a particular action is improper is determined by a consideration of seven factors: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of the actions of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties." *Wagenseller v. Scottsdale Mem. Hosp.,* 147 Ariz. 370, 387, 710 P.2d 1025, 1042 (1985) (citing *Restatement (Second) of Torts* § 767 (1979)).

136.     "Intentional interference with contract requires the preponderance standard." *Wells Fargo,* 201 Ariz. 474, 496, 38 P.3d 12, 34 (2002). "A claim for tortious interference with a business expectancy is insufficient unless the plaintiff alleges facts showing the expectancy constitutes more than a mere 'hope.'" *Dube v. Likins,* 216 Ariz. 406, 412-13, ¶ 14, 167 P.3d 93, 99-100 (App. Div. 2, 2007).

137.     "Although the tort of tortious interference with a business expectancy covers situations that the tort of intentional interference with a contract does not, the former has only been available in those situations where the plaintiff can identify the specific relationship with which the defendant interfered" *Dube v. Likins,* 216 Ariz. 406, 414, ¶19, 167 P.3d 93, 101 (App. Div. 2, 2007) (internal quotations and citations omitted).

138.     As a general rule, an action for tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement, which in all probability would have been completed if the defendant had not interfered. To state a claim for tortious interference upon which relief may be granted, there must be a colorable economic relationship between the plaintiff and a third party with the potential to develop into a full contractual relationship" (*Id.*).

139.     "[T]he language used to define the elements of the tort of intentional interference with contract in the more recent cases does not limit the cause of action to a particular party to a contract." *Plattner v. State Farm Mut. Auto. Ins. Co.*, 168 Ariz. 311, 315, 812 P.2d 1129, 1133 (App. Div. 1, 1991).

140.     "The duty not to interfere with the contract of another arises out of law, not contract. In fact, the tort may be committed even where the plaintiff has no contractual rights but simply the prospect of a contractual relationship. *Restatement (Second) of Torts* § 766B comment c. also see, *Bar J Bar Cattle Co. v. Pace*, 158 Ariz. 481, 486, 763 P.2d 545, 550 (App. Div. 1, 1988).

141.     ROUNDTREE is "entitled to recover any and all pecuniary losses which proximately resulted from DEFENDANTS improper interference. This includes any and all benefits of the contract, which were denied by reason of said interference.

142.     **Count 11:** ROUNDTREE claims DEFENDANTS committed Gross Negligence misconduct, against ROUNDTREE in the untreated progression of his industrial injury rather the injury itself as well as the failure of DEFENDANTS to diagnose, treat or warn him including but not limited to substandard care, treatment, surgery, post-operative care and interfering with medical treatment in the execution of WC fraud scheme.

**A.R.S. § 12-2603 (A)**

143.     The Arizona legislature declared the purpose of A.R.S. § 12-2603 requires that a party asserting a claim against a health care professional "shall certify in a written statement that is filed and served with the claim or the designation of nonparty at fault whether or not expert opinion testimony is necessary to prove the health care professional's standard of care or liability for the claim." also see (Roundtree A.R.S. § 12-2603 Declaration at Exhibit A).

144.     A medical malpractice claim requires an allegation that [DEFENDANTS] owed a duty, there was a breach of that duty, and damages related to the breach of the duty. *Smethers v. Campion*, 210 Ariz. 167, 108 P.3d 946 (App. 2005); see also A.R.S. § 12-563

**A.R.S. § 12-561**

145.     "Medical malpractice action" or "cause of action for medical malpractice" means an action for injury or death against a licensed health care provider based upon such provider's alleged negligence, misconduct, errors or omissions, or breach of contract in the rendering of health care, medical services, nursing services or other health-related services or for the rendering of such health care, medical services, nursing services or other health-related services, without express or implied consent including an action based upon the alleged negligence, misconduct, errors or omissions or breach of contract in collecting, processing or distributing whole human blood, blood components, plasma, blood fractions or blood derivatives.

146.     Medical malpractice is negligence committed by medical professionals. For negligence to be "actionable" (having all the components necessary to constitute a viable cause of action), 1) there must be a duty owed to someone, 2) a breach of that duty, and 3) resulting harm or damage that is proximately caused by that breach. The simplest way

to apply the concept of proximate cause to medical malpractice is to ask whether, "but for" the alleged negligence, the harm or injury would have occurred.

**Actionable Malpractice**

147.    State laws govern the viability of causes of action for medical malpractice. The laws vary in terms of time limits to bring suit, qualifications of "expert" witnesses, cognizable theories of liability, and proper party defendants/proper party plaintiffs. Notwithstanding these differences, there are common requisites for all cases.

148.    First and foremost, a physician must owe a duty to patients before his or her competency in performing that duty can be judged. In U. S. JURISPRUDENCE, a person has no affirmative duty to assist injured individuals, -in the absence of a special relationship with them (such as doctor-patient, attorney-client, guardian-ward, etc.)

149.    A doctor dining in a restaurant has no duty to come forward and assist injured others if they suffer a heart attacks while dining in the same restaurant. If the doctor merely continues with his meal and does nothing to help, the ailing others would not have an action for malpractice against him, notwithstanding their harm. However, once a doctor voluntarily decides to assist others or come to their aid, he or she becomes liable for any injury that results from any negligence during that assistance.

**Failure to Diagnose and Erroneous Diagnosis**

150.    Generally, a delay or failure to diagnose a disease is actionable, if it has resulted in injury or disease progression above and beyond that which would have resulted from a timely diagnosis. This situation may be difficult to prove. For example, a patient may allege that a doctor failed to timely diagnose a certain cancer, resulting in "metastasis" (spread of the cancer to other organs or tissues).

151.     But experts may testify that "micrometastasis" (spreading of the disease at the cellular level) may occur as much as ten years before a first tumor has been diagnosed, and cancerous cells may have already traveled in the bloodstream and lodged elsewhere, eventually to grow into new tumors. Therefore, it may be difficult in some cases to establish that a patient has suffered a worse prognosis because of the failure or delay in diagnosis.

152.     However, if a patient is treated for a disease or condition that he or she does not have, as in the instant case, and the treatment or medication itself or lack thereof may cause harm to the patient. This is in addition to the harm caused by the true condition continuing untreated. Most doctors are trained to think and act by establishing a "differential diagnosis." Doing so calls for a doctor to list, in descending order of probability, his or her impressions or "differing" diagnoses of possible causes for a patient's presenting symptoms.

153.     The key question in assessing a misdiagnosis for malpractice is to ask what diagnoses a reasonably prudent doctor, under similar circumstances, would have considered as potential causes for the patient's symptoms. If a doctor failed to consider the patient's true diagnosis on his/her differential diagnosis list or listed it but failed to rule it out with additional tests or criteria, then the doctor is most likely negligent.

**Failure to Treat and Erroneous Treatment**

154.     The most common way in which doctors are negligent by failing to treat a medical condition is when they "dismiss" the presenting symptoms as temporary, minor, or otherwise not worthy of treatment. This situation may result in an exacerbation of the underlying condition or injury, causing further harm or injury.

155.     For example only, an undiagnosed splinter or chip in a broken bone may result in the lodging of a piece of bone in soft tissue or internal bleeding caused by the sharp edge of the splintered bone. Erroneous treatment is most likely to occur as a result of a misdiagnosis. However, a doctor who has correctly diagnosed a disease or condition may nonetheless fail to properly treat it.

**Substandard Care, Treatment and Surgery**

156.     The standard of care which is owed to people as a patient is that which represents that level of skill, expertise, and care possessed and practiced by physicians found in the same or similar community as the relevant one, and under similar circumstances. However, the advent of "national board" exams for new doctors and "board certifications" for doctor-specialists has resulted in a more uniform and standard practice of medicine not dependent upon geographic locality.

157.     All licensed physicians should possess a basic level of skill and expertise in diagnosing and treating general or recurring types of illnesses and injuries. Thus, a general practitioner who has administered substandard cardio-pulmonary resuscitation (CPR) to a heart attack victim (who subsequently dies as a result of the substandard care) cannot defend that he or she was not a "cardio-pulmonary specialist." A general practitioner from virtually any other area in the United States could most likely testify as to the level of care and expertise that is to be expected under the circumstances.

158.     Conversely, a board-certified cardiopulmonary specialist could not testify that the general practitioner should have done everything that the specialist might have done with his advanced skill and training. Nor, under the locality rule, could an oncology specialist in private practice in Smalltown, U. S. A., be held to the same standard of care as an

36

oncology specialist in a large urban university teaching hospital that has state-of-the-art equipment and facilities.

159.    Because doctors are often reluctant to testify against their colleagues (referred to by lawyers as the "conspiracy of silence"), it may be difficult to find an unbiased expert willing to testify against a negligent doctor or label the care as substandard.

160.    This resistance applies even when they practice on opposite sides of the country: they may know one another from the national board certifications or fellowship programs established for specialists. And, that is certainly the case here, and descriptive of the lack counsel, as well.

161.    Moreover, truly competent doctors usually communicate with one another for professional "brainstorming" on diagnosing or treating some conditions or may collaborate in research or academic publications.

**Gross Negligence**

162.    "A party is grossly or wantonly negligent if he acts or fails to act when he knows or has reason to know facts which would lead a reasonable person to realize that his conduct not only creates an unreasonable risk of bodily harm to others but also involves a high probability that substantial harm will result." *Walls v. Ariz. Dep't of Pub. Safety*, 826 P.2d 1217, 1221 (Ariz. Ct. App. 1991).

163.    Gross or wanton negligence "differs from ordinary negligence in quality and not degree" (*Id.*). The issue of gross negligence is ordinarily a question of fact for the jury, but a court may grant a defendant's motion for summary judgment if "no evidence is introduced that would lead a reasonable person to find gross negligence" (*Id.*). A jury can recognize and track the natural and continuous sequence of events as gleaned from the RECORD.

**Proximate Cause**

164.     Like gross negligence, proximate cause is generally a question of fact for the jury,

and it should reach the jury here. *Barrett v. Harris*, 86 P.3d 954, 958 (Ariz. Ct. App.

2004). "Arizona law holds that cause-in-fact exists if the defendant's act helped cause the

final result and if that result would not have happened without the defendant's act.

Defendant's act need not have been a 'large' or 'abundant' cause of the final result; there

is liability if the result would not have occurred but for defendant's conduct, even if that

conduct contributed 'only a little' to plaintiff's injuries. Arizona also recognizes that more

than one person may be liable for causing an injury and that a particular defendant may

not avoid liability for his causative act by claiming that the conduct of some other person

was also a contributing cause." *Ontiveros v. Borak*, 136 Ariz. 500, 505, 667 P.2d 200,

205 (1983).

165.     The RECORD, demonstrates proximate cause, making a prima facie case of gross

negligence against DEFENDANTS and shows a "causal relationship [] readily apparent

to the trier of fact." *Gregg v. Nat'l Med. Health Care Servs., Inc.*, 145 Ariz. 51, 54, 699

P.2d 925, 928 (App. 1985); see also *Peacock v. Samaritan Health Serv.*, 159 Ariz. 123,

126, 765 P.2d 525, 528 (App. 1988) (exception to general rule requiring expert medical

testimony when "'negligence is so grossly apparent that a layman would have no

difficulty in recognizing it'"), quoting *Riedisser v. Nelson*, 111 Ariz. 542, 544, 534 P.2d

1052, 1054 (1975).

166.     Acts unbroken by any efficient intervening cause, that produces an injury, in

whole or in part, and without which the injury would not have occurred. *Robertson v.*

*Sixpence Inns of America*, Inc., 163 Ariz. 539, 546, 789 P.2d 1040, 1047 (1990);

*Markiewicz v. Salt River Valley Water Users' Ass'n,* 118 Ariz. 329, 338 n. 6, 576 P.2d 517, 526 n. 6 (App.1978).

167.     **COUNT 12:** ROUNDTREE claims DEFENDANTS committed Legal Malpractice against ROUNDTREE.

168.     **COUNT 13:** ROUNDTREE claims DEFENDANTS Negligence against ROUNDTREE. "To establish a claim for negligence, a plaintiff must prove four elements: (1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages." *Gipson v. Kasey,* 214 Ariz. 141, 143, ¶9, 150 P. 3d 228, 230 (2007) (citing *Ontiveros v. Borak,* 136 Ariz. 500, 504, 667 P.2d 200, 204 (1983)). "The first element, whether a duty exists, is a matter of law for the court to decide." *Gipson v. Kasey,* 214 Ariz. 141, 143, ¶9, 150 P. 3d 228, 230 (2007).

169.     **COUNT 14:** ROUNDTREE claims DEFENDANTS Negligent Inflection of Emotional Distress (NIED) against ROUNDTREE. "[A] physical injury, as well as a long-term physical illness or mental disturbance, constitutes sufficient bodily harm to support a claim of negligent infliction of emotional distress." *Monaco v. HealthPartners of S. Ariz.,* 196 Ariz. 299, 303, 995 P.2d 735, 739 (App. Div. 2, 1999). "In order for there to be recovery for the tort of negligent infliction of emotional distress, the shock or mental anguish of the plaintiff must be manifested as a physical injury." *Keck v. Jackson,* 122 Ariz. 114, 115-16, 593 P.2d 668, 669-70 (1979).

170.     "In Arizona, a plaintiff may not recover for negligent infliction of emotional distress unless the shock or mental anguish is accompanied by or manifested as a physical

injury." *Gau v. Smitty's Super Valu, Inc.*, 183 Ariz. 107, 109, 901 P.2d 455, 457 (App. Div. 1, 1995).

171.     **COUNT 15:** ROUNDTREE claims DEFENDANTS acting in a consistent pattern of behavior in violation of RICO, including mail fraud against ROUNDTREE.

## DEMAND

172.     ROUNDTREE is entitled to recover punitive damages and/or treble damages and is demanding $711 Million US Dollars for the deliberate, outrageous, extreme, evil acts Including but not limited to, damages in the form of general, compensatory, actual, expect, equitable, restitutionary, aggravated, and incidental damages to be gleaned from the facts/evidence. Special damages specified as costs and fees of this Honorable Court, lost earning capacity, lost income, night sweats, high blood pressure, rapid weight loss/gain, irregular sleeping patterns, irritable bowel syndrome, restlessness, and anxiety in anticipation of first and second digit joint replacement. And whatever else this Honorable Court deems fair and just.

## CLOSING

173.     Fool me once, shame on you; Fool me twice, shame on me. If "to say to [ROUNDTREE] [] who has been wronged, 'You had a remedy but before the wrong was ascertainable to you, the law stripped you of your remedy;' makes a mockery of the law." (citation omitted) *Berry v. Branner*, 245 Or. 307, 421 P.2d at 998 (1966).

174.     Respectfully submitted under the pains and penalties of perjury and the lovingkindness of my three children, signed and sealed this 11th day of July 2012:)

/s/ _____
1149 E. Hidalgo Avenue
Phoenix, Arizona 85040
602.472.8269/seanroundtree@live.com

_____
Notary

MICHELLE L TORRES
Notary Public - Arizona
Maricopa County
My Commission Expires
April 6, 2015

40

**STATE OF ARIZONA**
**COUNTY OF** Maricopa
This foregoing instrument was acknowledged
before me this 11 day of July, 2012
By SEAN Roundtree
Notary Public _____
My Commission Expires: 06 /april 2015

## ROUNDTREE A.R.S. § 12-2603 DECLARATION

Pursuant to A.R.S. § 12-2603, ROUNDTREE hereby certifies that beyond the misconduct, disinformation, constructed confusion, misrepresentations, omissions, fraudulent concealment and constructive fraud contained within the RECORD, a gleaning of the facts shows gross negligence therefore, expert testimony is **NOT** required for claims against a licensed health care professional's standard of care or liability for: Aiding & Abetting; Battery; Bad Faith; Breach of Fiduciary Duty (Request for Tort Damages); Breach of the Implied Covenant of Good Faith & Fair Dealing (Request for Tort Damages); Civil Conspiracy; Civil Rights Violations 42 USC §1981, §1983 and § 1985(a); Gross Negligence based in Medical Malpractice; Intentional Infliction of Emotional Distress; Legal Malpractice; Misrepresentation; Negligence; Negligence Infliction of Emotional Distress; RICO Statutes; and Tortious Interference with a Business Expectancy in commission of WC fraud scheme. Respectfully submitted under the pains and penalties of perjury and the lovingkindness of my children, signed and sealed this 11th day of July 2012 :)

/s/ Sean Alex Roundtree,
1149 E. Hidalgo Avenue
Phoenix, Arizona 85040
602.472.8269/seanroundtree@live.com

Notary

STATE OF ARIZONA
COUNTY OF _Maricopa_
This foregoing instrument was acknowledged before me this _11_ day of _July, 2012_
By _SEAN Roundtree_
Notary Public _Michelle Torres_
My Commission Expires: _6 April 2015_

MICHELLE L TORRES
Notary Public - Arizona
Maricopa County
My Commission Expires
April 6, 2015

1